**FILED**
**U.S. District Court**
**District of Kansas**
07/23/2026
**Clerk, U.S. District Court**
By: SND Deputy Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

JORDAN M. LEFFEL,

    **Plaintiff,**

    v.                      **CASE NO.  26-3055-JWL**

COLBY CRUM, et al.,

    **Defendants.**

**MEMORANDUM AND ORDER**

Plaintiff brings this pro se civil rights action under 42 U.S.C. § 1983.  Although Plaintiff is currently incarcerated at the El Dorado Correctional Facility in El Dorado, Kansas, his claims relate to his incarceration at the Lansing Correctional Facility in Lansing, Kansas ("LCF").  The Court granted Plaintiff leave to proceed in forma pauperis.  On April 6, 2026, the Court entered a Memorandum and Order (Doc. 5) ("M&O") finding that the proper processing of Plaintiff's claims could not be achieved without additional information from appropriate Kansas Department of Corrections ("KDOC") officials.  *See Martinez v. Aaron*, 570 F.2d 317 (10th Cir. 1978); *see also Hall v. Bellmon*, 935 F.2d 1106 (10th Cir. 1991).  Accordingly, the Court ordered the appropriate KDOC officials to prepare and file a *Martinez* Report.  The M&O provides that "[o]nce the Report has been received, the Court can properly screen Plaintiff's Complaint under 28 U.S.C. § 1915A." (Doc. 5, at 6.)  The *Matinez* Report (Docs. 10, 12) (the "Report") has now been filed.  The Courts screening standards are set forth in the M&O.

**I.  Nature of the Matter before the Court**

Plaintiff alleges that on February 2, 2025, he and his cellmate were removed from their cell to use the phones.  (Doc. 1, at 3.)  Because they were in a restrictive housing unit, they were placed

1

in cuffs and belly chains based on restrictive housing protocol requiring all inmates to be secured before exiting their cells. *Id*. Plaintiff alleges that he and his cellmate exited their cell restrained and they should have been secured to the phone station before any other inmates were secured and released from their cell. *Id*. at 3–4. Plaintiff claims that the cell to his left was on the list to use the phones with him, but instead CO1 Crum opened the cell to the right without restraining one of the two inmates housed in the cell. *Id*. at 4. Plaintiff alleges that the unrestrained inmate had been screaming threats at everyone on the run that entire day. *Id*. at 5.

Plaintiff alleges that while he was being escorted by CO1 Goldston he saw the other inmate rushing toward him with an "ice pick styled weapon." *Id*. at 4. Plaintiff claims that instead of stopping the unrestrained inmate, Defendant Crum took ahold of Plaintiff's cellmate, who was restrained. Plaintiff attempted to step behind Goldston for protection, but instead of deploying his mace or grabbing the attacker, Goldston fled, leaving Plaintiff to fend for himself even though his hands were cuffed to his waste. *Id*. Plaintiff claims that the inmate began stabbing Plaintiff several times before one of the officers finally hit the panic button to trigger a response team. *Id*. Plaintiff claims that he and the attacker were maced and the attacker was then placed in cuffs. *Id*. Plaintiff alleges that after the chemical detox, his attacker was again housed in the cell next to Plaintiff. *Id*. Plaintiff claims that officers, including Goldston, later joked about the event. Plaintiff claims that Warden Howes failed to fire Crum and Goldston. *Id*. at 5.

Plaintiff claims that Defendants violated his right to be free from cruel and unusual punishment and provided him with unsafe living conditions. *Id*. Plaintiff names as defendants: Colby Crum, COI at LCF; Jesse Howes, LCF Warden; and Gene Goldston, Jr., CO1 at LCF. Plaintiff seeks compensatory damages "due to the gross negligence of KDOC causing [him] physical pain." *Id*. at 7.

## II.  The Report

The Report includes video footage of the incident. (Doc. 10, at 3) (citing Exh. 7).  The

Report summarizes the video as follows:

> Upon review of Exhibit 7 (part a), it can be seen as officers Goldston and Crum escort a resident up the stairs of the cellhouse of A7 and return that resident to cell 216. (Exhibit 7, part a, time stamp 0:00:00 to 0:00:56, time of day 06:58:20PM to 6:59:12PM). Both officers can be seen moving on to cells 214 and 212, both look into the cells to see the residents within. (Id). Exhibit 7, part b, picks up exactly where part a left off with showing CS I Goldson [sic] approach cell door 212 (212 housing Plaintiff and his cellmate) while CO I Crum remains at cell 214 appearing to have a conversation with the residents within that cell. (Exhibit 7, part b, time stamp 0:00:00 to 0:00:56, time of day 6:59:12PM to 7:00:08PM). Officer Crum (wearing a black cap) appears to be communicating with the residents in cell 214 and appears the residents do not want to allow Officer Crum to put on restraints through the food port, Officer Crum then moves on to cell 210. (Id., time stamp 0:00:14 to 0:00:19, time of day 6:59:27PM to 6:59:32PM). Officer Crum then stands in front of the door to cell 210 and looks to be waiting for directive from Officer Goldston, Officer Goldston then walks over to Officer Crum very briefly then walks back to cell 212 and opens the door. (Id., time stamp 0:00:19 to 0:00:45, time of day 6:59:32PM to 6:59:58PM).
>
> Upon the door to cell 212 opening, the video shows both residents within the cell proceeding out of the cell and towards Officer Goldston. (Id.). Officer Goldston can be observed continuing to restrain Plaintiff's cellmate as Plaintiff steps around Officer Goldston and moves closer to cell 214. (Id., time stamp 0:00:45 to 0:00:56, time of day 6:59:58PM to 7:00:07PM).  This concludes Exhibit 7, part b; part c picks up where part b ends. (Exhibit 7, parts b and c). Plaintiff can be seen pacing back and forth on the run between cells 216 and 214 while holding a tablet in his hands, only his hands appear to be restrained at this point as the waist portion of the restraints hang loose in front of him. (Exhibit 7, part c, time stamp 0:00:00 to 0:00:08, time of day 7:00:07PM to 7:00:17PM). At the same time, it can be seen that Officer Goldson [sic] is finishing putting on the waist restraints on Plaintiff's cellmate, while Officer Crum remains in front of cell 210. (Id.). Next, Plaintiff is looking towards the officers and then appears to be communicating with Officer Goldston and starts to look down at the tablet in his hands while Officer Goldston moves behind the Plaintiff. (Id., time stamp 0:00:08 to 0:00:14, time of day 7:00:17PM

to 7:00:23PM). At this same time, Officer Crum opens the door to cell 210 and a very tall and large resident (resident Cornelius Bell, #2000060549) walks out onto the run and appears to have his hands restrained. (Id.).

In a matter of seconds, a masked resident in an all-grey sweatsuit (resident Edwin Bradley, #2100210988) comes out from behind the resident Bell and Officer Crum appearing first to run down the stairs and then back up the stairs past resident Bell and Officer Crum towards Plaintiff and Officer Goldston. (Id., time stamp 0:0014 to 0:00:20, time of day 7:00:17PM to 7:00:29PM). During this time frame, it does appear that Officer Crum was surprised at the appearance of the masked resident Bradley and does appear to try to chase him down the stairs and then back after him but is blocked by resident Bell. (Id.). Meanwhile, Officer Goldston appears to first start to place the waist restraints onto Plaintiff but then looks up to the new commotion and does not appear to have successfully placed the waist restraint. (Id.). As resident Bradely [sic] approaches, Plaintiff, Plaintiff's cellmate and Officer Goldston are all close together and back up against the wall in front of cells 218 and 216. (Id.). Resident Bradley then quickly moves to start striking Plaintiff with an object in his hand with a downwards motion from above. (Id., time stamp 0:00:20 to 0:00:22, time of day 7:00:29PM to 7:00:31PM). Plaintiff tries to flee the attack and moves from the right side of Officer Goldston to the left towards cells 216 and 214.

Officer Crum is still being blocked by resident Bell and Officer Goldston is seen advancing towards resident Bradely [sic] while holding up his left hand towards resident Bradely [sic] and appears to try to grab at resident Bradely [sic]. (Id.). Bradley continues to try stabbing Plaintiff with the object in his hand. (Id.). Plaintiff's cellmate then advances towards cell 212's open doorway where he remains the majority of the time of the attack. (Id., time stamp 0:00:22 to 0:00:41, time of day 7:00:31PM to 7:00:50PM). Officer Crum is continually blocked by resident Bell but is able to reach an arm about Bell to administer chemical spray at resident Bradley. (Id., time stamp 0:00:30, time of day 7:00:38). At the same time Officer Goldston also can be seen spraying resident Bradley with chemical spray. (Id.). The attack started, lasted, and ended within a matter of seconds, and both officers appeared to have reasonably and quickly responded to the incident. This does conflict with the statements within Plaintiff's Petition that the officers fled and did not assist him in the attack. At the conclusion of part c, the Plaintiff and resident Bradley have been separated, and resident Bradley is being placed into restraints by Officer Crum near the top of the stairs as Officer Goldston takes Plaintiff further way from the others. (Id., time stamp 0:00:41 to 0:00:56, time of day 7:00:50PM

4

> to 7:01:03PM).
> Exhibit 7, parts d and e, show more officers responding to the scene and the residents being taken out of the cell house. (Exhibit 7, parts d and e). Exhibit 7, parts f through h, is the same timeframe of footage but from a different angle.

(Doc. 10, at 3–5.)

The Report provides that none of the documentation from the use of force indicates that either officer fled, hid, or failed to respond to the incident in question.  (Doc. 10, at 6) (citing Exhibits 5–7.)  Both officers indicated in their incident reports and affidavits that they were not aware of any issues with Plaintiff and resident Bradley prior to the incident and Plaintiff did not report any issues with Bradley.  *Id*. (citing Exhibits 5, 11, 12.)

The Report provides that there is a record of Plaintiff seeing medical staff on February 2, 2025, at approximately 8:30 pm, and there are notes indicating the appearance of injuries to his shoulder, jaw, and ribs with wounds about the diameter of a pencil.  *Id*. at 7 (citing Exh. 2, at 1–4.)  "The medical staff assessed his injuries as non-urgent and instructed him to return to the clinic if Plaintiff develops any complications or presents with signs of infection."  *Id*.

The Report includes the affidavit of Darcie Holthaus, Corrections Manager II for the KDOC.  (Exh. 16, Doc. 10–16.)[1]  The Report states that she is tasked with the responsibility of receiving, reviewing, and responding to KDOC resident emergency and non-emergency grievances and personal injury complaints, and upon review, she did not find any emergency grievance, regular grievances, or personal injury complaints related to February 2, 2025 attack on Leffel.  *Id*. at ¶¶ 6 and 7.  The Report states that "it appears Plaintiff had failed to attempt any kind of administrative remedy to resolve this complained of injury or reasonably notify KDOC/LCF staff of any need for protection from other residents."  (Doc. 10, at 8.)

---

[1]  Although the Report refers to the affidavit as Exhibit 17, it is designated as Exhibit 16.  *See* Doc. 10, at 8 and 10 (Exhibit List).

## III. DISCUSSION

An inmate is required by the Prison Litigation Reform Act ("PLRA") to exhaust all available prison administrative remedies before filing a complaint in federal court. Section 1997e(a) expressly provides:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a); *see also Little v. Jones*, 607 F.3d 1245, 1249 (10th Cir. 2010) (stating that under the PLRA "a prisoner must exhaust his administrative remedies prior to filing a lawsuit regarding prison conditions in federal court") (citations omitted).  "Congress enacted § 1997e(a) to reduce the quantity and improve the quality of prisoner suits; to this purpose, Congress afforded corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Porter v. Nussle*, 534 U.S. 516, 524–25 (2002) (citation omitted); *see also Jones v. Bock*, 549 U.S. 199, 219 (2007) (stating that "the benefits of exhaustion include allowing a prison to address complaints about the program it administers before being subjected to suit, reducing litigation to the extent complaints are satisfactorily resolved, and improving litigation that does occur by leading to the preparation of a useful record") (citations omitted).

This exhaustion requirement "is mandatory, and the district court [is] not authorized to dispense with it." *Beaudry v. Corrections Corp. of Am.*, 331 F.3d 1164, 1167 n. 5 (10th Cir. 2003), *cert. denied*, 540 U.S. 1118 (2004); *Little*, 607 F.3d at 1249.  A prison or prison system's regulations define the steps a prisoner must take to properly exhaust administrative remedies and a prisoner "may only exhaust by properly following all of the steps laid out" therein. *Little*, 607 F.3d at 1249 (citing *Woodford v. Ngo*, 548 U.S. 81, 90 (2006)).  "An inmate who begins the grievance process but does not complete it is barred from pursuing a § 1983 claim under [the]

PLRA for failure to exhaust his administrative remedies." *Jernigan v. Stuchell*, 304 F.3d 1030, 1032 (10th Cir. 2002) (citation omitted). "The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Jones*, 549 U.S. at 218.

For Kansas state prisoners, the administrative remedies require the inmate to seek an informal resolution with personnel who work with the inmate on a daily basis. K.A.R. § 44–15–101(b). If the informal resolution is unsuccessful, the inmate must progress through a three-level process that includes submitting a grievance report form to (1) the appropriate unit team member, (2) the warden of the facility, and (3) the office of the secretary of corrections. K.A.R. § 44–15–101(d). The procedure to follow at each level is described in detail in the Kansas Administrative Regulations. § 44–15–102; *see also Garza v. Correct Care Solutions*, 2011 WL 2580299, at *2 (D. Kan. 2011), *aff'd* 451 F. App'x 775 (10th Cir.) (granting summary judgment for failure to exhaust claims against Correct Care Solutions where plaintiff failed to allege that he sought relief on his claims first through his unit team, then the warden, and finally from the Secretary of Corrections).

This Court has held that:

> The regulations do not provide for exhaustion "by default" if the informal resolution is unsuccessful. If an inmate does not receive a response to a grievance, they "may move to the next stage of the grievance procedure if a timely response is not received at any step in the grievance process." K.A.R. 44-15-101b. "If an inmate does not receive a response from the unit team within 10 calendar days, a grievance report may be sent to the warden without the unit team signature or signatures." K.A.R. 44-15-102(a)(2).

*Clay v. Esparza*, 2020 WL 6117856, at *4 (D. Kan. 2020).

In *Kidd v. Baker*, the plaintiff alleged that he filed emergency grievances. *Kidd v. Baker*, 2022 WL 17485932, at *6 (D. Kan. 2022). The Court concluded that the plaintiff failed to exhaust his administrative remedies, stating that "[w]hile he sent letters or 'petitions' to the Secretary of Corrections, he did not follow the established procedure." *Id*. "Simply presenting a defective or non-complying grievance . . . does not constitute exhaustion of remedies." *Id*. (quoting *Brewer v. Mullin*, 130 F. App'x 264, 265 (10th Cir. 2005)).

In a suit governed by the PLRA, failure to exhaust is an affirmative defense and the defendant has the burden of proof regarding exhaustion of administrative remedies. *Roberts v. Barreras*, 484 F.3d 1236, 1241 (10th Cir. 2007). "Although a defendant bears the burden of 'proving that the plaintiff did not [exhaust his] administrative remedies,' once the defendant has carried that burden, 'the onus falls on the plaintiff to show that remedies were unavailable to him.'" *May v. Segovia*, 929 F.3d 1223, 1234 (10th Cir. 2019) (alteration in original) (citing *Tuckel v. Grover*, 660 F.3d 1249, 1254 (10th Cir. 2011)).

Darcie Holthaus, Corrections Manager II for the KDOC, provided an affidavit declaring that she acts as the designee for the Secretary of Corrections for the purpose of reviewing resident grievances and personal injury claims from the correctional facilities statewide, and for receiving emergency grievances. (Exh. 16, Affidavit of Darcie Holthaus, Doc. 10–16, at ¶¶ 1–3). She searched Plaintiff's records and was unable to locate any grievances or personal injury claims related to the February 2, 2025 incident. *Id*. at ¶ 6. Courts in this district have found that a defendant satisfies the initial burden to show that a plaintiff failed to exhaust administrative remedies where the defendant provides a KDOC records custodian affidavit that explains that they reviewed the grievance records and found evidence that a plaintiff availed himself of the grievance

process but did not complete it. *See Lewis v. Carrell*, 2014 WL 4450147, at *10 (D. Kan. 2014) (citation omitted).

The issue of Plaintiff's failure to exhaust his available administrative remedies prior to filing his lawsuit must be determined before reaching the merits of his lawsuit. *Little*, 607 F.3d at 1249 ("unexhausted claims cannot be brought in court") (citation omitted); *see also Jernigan*, 304 F.3d at 1032 (an inmate who does not complete the grievance process is barred from pursuing a §1983 claim). Under the PLRA "a prisoner must exhaust his administrative remedies prior to filing a lawsuit regarding prison conditions in federal court." *Little*, 607 F.3d at 1249 (citations omitted). Therefore, the Court will grant Defendants an opportunity to file a dispositive motion on the issue of exhaustion. Defendants will be given another opportunity to respond on the merits if Plaintiff's claims are not dismissed for failure to exhaust. Plaintiff is also given an opportunity to respond to the Report. The Court will enter a separate service order for Defendants.

**IT IS THEREFORE ORDERED BY THE COURT** that Plaintiff is granted until **August 24, 2026,** to respond to the Report at Docs. 10, 12.

**IT IS FURTHER ORDERED** that the Court will enter a separate service order for service on Defendants.

**IT IS FURTHER ORDERED** that a Defendants shall have **thirty (30) days** from the date service is executed to file any dispositive motion on the issue of exhaustion.

**IT IS SO ORDERED**.

Dated July 23, 2026, in Kansas City, Kansas.

**S/  John W. Lungstrum**
**JOHN W. LUNGSTRUM**
**UNITED STATES DISTRICT JUDGE**